[Civ. No. 14438. Second Dist., Div. Three. Nov. 16, 1944.]

ROSALYN E. THOMPSON, as Executrix, etc., Respondent, v. ANNA BELLE THOMPSON LEVEREAU, Appellant.

James T. Boyle, McLaughlin & McGinley and James A. McLaughlin for Appellant.

Rollin L. McNitt and Edythe Jacobs for Respondent.

FOX, J. pro tem.—For some years prior to March 24, 1935, Charles and Louis Thompson, who were brothers, operated in the city of Los Angeles a business known as the United States Burglar Alarm Company. On that date Charles died. On April 18, 1935, Louis, Marie Thompson, the widow of Charles, and Anna Belle Thompson Levereau, sister of Louis, entered into a partnership agreement for the purpose of conducting the said burglar alarm business. It was agreed that Marie had a 50 per cent interest in the business and that Louis and Mrs. Levereau each had a 25 per cent interest. The partnership agreement specified that profits and losses should be allocated in the proportion of their respective interests. It

provided that Marie and Louis were to be the active partners. They agreed to ''give their entire time and attention to the conduct of said business.'' Mrs. Levereau signed a letter, bearing the same date as the partnership agreement, authorizing the payment of any profits from her interest in the business to her brother Louis, and stating that they were ''to be shown on the books of the company as having been paid to'' him. In April, 1937, a more elaborate partnership agreement was signed by the parties. It specified their interests in the same proportions and gave an option to the partners to buy the interest of another partner before it could be sold to anyone else. In addition to the above provisions of the 1937 agreement, it also allocated the specific duties to be performed by the two active partners—Marie and Louis. It further provided that if either Louis or Marie were absent from the city, ill, or for any other reason was unable to perform his or her duties, then the other would perform them. No duties were assigned Mrs. Levereau.

Louis lived in the home of his sister, Mrs. Levereau, for over twenty years prior to his marriage on November 12, 1938. She was in ill health for a period of some ten years and had been taking care of her mother, who was paralyzed. During that time Louis took care of her business affairs. She had ''absolute confidence in him'' according to her testimony.

On November 11, 1938, the day before Louis married the plaintiff, he and Mrs. Levereau executed an agreement reading as follows:

''THIS AGREEMENT, made and entered into this 11th day of November, Nineteen Hundred and Thirty-eight (1938), in the City of Los Angeles, County of Los Angeles, State of California

''By and between BELLE THOMPSON LEVEREAU, of the City of Los Angeles, County of Los Angeles, State of California, Party of the First Part, and LOUIS W. THOMPSON, of the same place, Party of the Second Part,

''For and in consideration of Ten ($10.00) Dollars in hand paid each to the other, receipt of which is hereby acknowledged, and the further consideration of the covenants herein contained,

''The said parties hereto agree as follows, to-wit:

''That whereas the party of the first part is a co-partner to the extent of a quarter interest in that certain business

known and designated as the UNITED STATES BURGLAR ALARM Co., sometimes designated as the U. S. Burglar Alarm Co., located at 1315 West Pico Street, in the City of Los Angeles, County of Los Angeles, State of California, and whereas the said party of the first part is unable to devote any time or take any active part in the conduct or management of said business,

"Now, THEREFORE, the said party of the first part, and the party of the second part, covenant and agree as follows, to-wit:

"The said party of the second part agrees to act for and represent the said party of the first part in the conduct and management of said business so far as her interest therein requires, and pay to the said party of the first part from the earnings of her interest in said business during the period of her lifetime not less than One Hundred ($100.00) Dollars each and every month for the said period of her life.

"The said party of the first part agrees to accept the said sum of not less than One Hundred ($100.00) Dollars each and every month for the period of her life as hereinbefore provided, and in consideration therefor, upon her the first party's death the said quarter interest which she has in said business shall go to the said Louis W. Thompson, party of the second part, as his separate property, and in the event of his death prior to the death of the said party of the first part then upon the death of the said Belle Thompson Levereau, party of the first part, said quarter interest in said business shall pass to the Estate of Louis W. Thompson.

"It is FURTHER COVENANTED AND AGREED, between the parties hereto that in the event of the sale or other disposition of said business during the lifetime of said party of the first part, the parties hereto shall agree to a fixed sum to be paid to the party of the first party by the party of the second part, or his representative, such sum to be based upon a fair and reasonable proportion of the sale price received as her quarter interest bears to the price received for said business.

"This agreement shall be binding upon the heirs, executors, administrators and assigns of the parties hereto.

> "BELLE THOMPSON LEVEREAU,
> Party of the First Part
>
> "LOUIS W. THOMPSON,
> Party of the Second Part

"WITNESSES:
"FRED J. SPRING
"MARIE K. THOMPSON

"As a Co-partner, I have no objection to this agreement.
"MARIE K. THOMPSON
Co-partner."

On the same day an agreement was signed by all the partners giving Louis a credit of $1,339, which was the amount he had overdrawn his share of the income, for the use of his private automobile in the company's business.

Louis died May 20, 1942. Plaintiff, as executrix of the estate of Louis, claimed that the quoted agreement of November 11, 1938, between Louis and Mrs. Levereau, was an assignment of the one-fourth interest therein mentioned, subject to the payment to Mrs. Levereau during her lifetime of at least $100 per month from the earnings of said one-quarter interest. Mrs. Levereau contended that the agreement did not transfer her interest in the partnership but was merely a working agreement between her and Louis which terminated on his death. Following this controversy plaintiff filed a complaint for declaratory relief. The court interpreted the agreement in accordance with plaintiff's contention and further held that in the event of a sale of the business during the lifetime of the defendant the amount she would be entitled to receive for her interest would be based on its value on November 11, 1938, the date of the agreement.

Two principal questions are involved: (1) Does the agreement of November 11, 1938, constitute a present assignment (i. e. an assignment as of that date) of defendant's quarter interest in the partnership; (2) do the circumstances surrounding the execution of the agreement and the subsequent conduct of the parties indicate an intent to make such an assignment? Both of these questions must be answered in the negative.

Taking the agreement "by its four corners" it is first observed that there are no words of present assignment therein. Nor do we find any language which implies such an intent. On the other hand certain of the language indicates quite the contrary. At the outset the agreement recognizes that defendant has "a quarter interest" in the burglar alarm business and that she "is unable to devote any time or take any active part in the conduct or management of said busi-

ness." Louis then agrees to act for and represent her "in the conduct and management of said business so far as her interest therein requires." This language plainly indicates that she has an interest in the business and that because of her inability to devote any time to, or to take any active part in, the conduct and management of the business, Louis is "to act for and represent" "her interest therein." Certainly there is nothing in this language which indicates an intention to then assign her interest in the business.

The agreement then provides that Louis will pay defendant "from the earnings of her interest in said business" not less than $100 per month for the balance of her lifetime. These payments are to be made from the earnings of *her* interest in the business, not from his. The clear implication is that she was retaining her acknowledged "quarter interest." If this agreement had been intended as a present assignment of her interest in the business to Louis there would have been no point to his agreeing to make the specified future monthly payments "from the earnings of her interest in said business" because she would no longer have had a partnership interest therein. Her interest in the business which was capable of producing earnings would have become Louis' property. On this point plaintiff poses the inquiry: "If no present assignment was intended by the instrument, how could Louis Thompson pay appellant [defendant] from the earnings of said interest the sum of $100.00, or any sum, as obviously he would not receive the earnings from that interest unless the interest were assigned to him?" The simple answer to this question is that pursuant to defendant's letter of authorization under date of April 18, 1935, the earnings from defendant's interest in the business were then being paid to Louis and had been so paid from the beginning except for a few months when the bookkeeper was unaware of the existence of this letter. No assignment of defendant's interest in the business was necessary for him to receive the earnings from her interest. This agreement by Louis to pay defendant $100 per month "From the earnings of her interest in the business" fixed the amount of those earnings he would be required to pay over to her. It permitted him to keep as compensation for representing defendant's quarter interest in the conduct and management of the business all the earnings from said interest over $100 per month. This was no doubt one of the purposes of the agreement. It is interesting here to

note that the profits of the company in 1938 were in excess of $12,000 and in 1941 in excess of $24,000.

Plaintiff asserts that under the assignment theory the interest which defendant would have for Louis to look out for "is the life estate in and to this partnership interest created by the instrument." Obviously the parties were not referring to such an interest when they were agreeing that Louis would "act for and represent" defendant's interest "in the conduct and management" of the business. The interest of the defendant there referred to is the same interest that is referred to in the previous paragraph. It is there recited that defendant has "a quarter interest" in the business and that she "is unable to devote any time or take any active part in the conduct or management of said business." Hence Louis is to represent *that* interest for her in the conduct and management of the business.

In the next paragraph of the agreement defendant agrees to accept $100 per month for the balance of her lifetime and that upon her death "the quarter interest which she has in said business shall go to" Louis "as his separate property." It is then provided that in the event of his death prior to hers "said quarter interest in said business shall pass" upon Mrs. Levereau's death to the estate of Louis. Certainly no intent to presently assign defendant's "quarter interest" in the business can be gleaned from this language or from the entire paragraph. On the contrary the clear implication is that defendant retained the ownership of her "quarter interest." Otherwise, she would not have any "quarter interest" to "go to" Louis in the event he survived her or to "pass to" his estate if she survived him.

The next paragraph deals with the situation in the event of a sale of the business during defendant's lifetime. It again recognizes that she has a "quarter interest" in the business and provides the basis by which she is to be compensated for "her quarter interest." The amount she is to receive is to be agreed upon. It is "to be based upon a fair and reasonable proportion of the sale price received as her quarter interest bears to the price received for said business." This language must be considered to see if it indicates an intention to presently assign her interest to Louis. We find no such intention. On the contrary the amount she is to receive for her quarter interest is dependent upon the "price

received for said business." This implies that she still has her quarter interest therein. Otherwise, there would be no point to fixing the amount defendant is to receive for her interest based upon its relation to the *price received* for the business. Whatever implication there is in this language is against rather than in support of plaintiff's contention of a present assignment of defendant's interest. Nor is there anything in the language here used to indicate that the amount defendant is to receive for "her quarter interest" in the event of a sale is to be based upon its value as of November, 1938.

Plaintiff points to the provision that in the event of a sale Louis agrees that he or his representative will pay defendant a fixed sum, to be agreed upon as therein specified, as indicating a present assignment since it shows that the parties contemplated that the proceeds of a sale of the business would be paid to Louis or his representative and not to defendant. This provision does not indicate such an intent. It is to be first noted that it is *her* quarter interest, not his, that is here mentioned. The fact that the money she would have received for "her quarter interest," had there been a sale, would have come through Louis or his representative rather than directly to her is not significant. The significant fact is that defendant was to be paid for *her* interest in the business in the event of a sale. It must also be remembered in this connection that Louis was undertaking to act for and represent defendant, who was in ill health and whose business he had been looking after for some years, in the conduct and management of the business. The natural and reasonable interpretation, therefore, in light of these circumstances, is that Louis was undertaking to represent and act for defendant in the event of a sale.

Plaintiff seems to argue that the provision making the agreement binding on the heirs, executors, administrators and assigns of the parties indicates an intention to make a present assignment. The purpose of such a provision is not to define or determine the character or extent of an obligation created by an instrument but to show that whatever obligation is created by the document is binding on those who claim under or through the parties thereto.

Plaintiff also argues that the fact that the third partner, Marie Thompson, signed a statement at the end of the docu-

ment stating that as a copartner she had no objection to this agreement indicates that a present assignment of defendant's interest was intended. This proposition is lacking in foundation because in the partnership agreement between these parties consent of other partners was required only in the event of the sale of a partner's interest to an outsider.

Whether we consider the agreement in its entirety or analyze it paragraph by paragraph, we are unable to find an intention expressed therein to make a present assignment of defendant's interest in the business to Louis.

Plaintiff argues that the circumstances surrounding the parties at the time the agreement was executed show an intention to make a present assignment of defendant's interest. Bearing in mind the defendant's physical condition, her lack of active participation in the business, the fact that Louis had looked after her affairs for some years and was to be married the next day, it seems clear that the parties were undertaking to work out an arrangement whereby Louis would represent defendant's interest in the business, receive the earnings as he had virtually from the inception of the partnership and pay defendant therefrom a fixed minimum per month. They were also attempting to cover the situation that would arise in the event of a sale of the business or upon the death of the defendant. Finally, by the agreement executed at the same time by all three of the partners giving Louis certain credit for the use of his personal automobile in the business, they were attempting to settle up and adjust their partnership affairs. In this connection it is proper to note that the agreement between Louis and defendant was prepared by the company attorney at the former's direction. Assignments are among the most common of legal documents and it is a simple matter to find language to express an intention to make an assignment of a property interest. The absence, therefore, of words of assignment, in view of the situation and relation of the parties, is not without significance. The record does not disclose any discussions between the parties with respect to said agreement or the purpose thereof prior to its presentation by the attorney for execution. As to what was said at that time, defendant testified: "THE COURT: . . . Just tell what he [Louis] said or did. Q. By MR. McLAUGHLIN: Just say what he said and did and what the others said and did. A. Well, he said—— I told him I did not want to sign it, and he said I had to. 'You know,' he

said, 'it is only until we sell the business.' They often talked about selling the business. And so he insisted on my signing it, and so I did.'' Plaintiff points to this testimony of defendant that she did not want to sign the agreement as indicating that she must have understood she was parting with something more than the income from the one-quarter interest. There is no basis for such an inference for it is unmistakably clear that the defendant's reluctance to sign the agreement was because she was not satisfied with $100 per month. If the agreement effected a transfer of defendant's quarter interest it was for all time; if it concerned only the income, it would, of course, not endure after a sale should be made. The impression we gain from this testimony is that the parties had in mind only the arrangement with respect to the income from defendant's share until a sale should be made. We fail to find in the circumstances surrounding the execution of the agreement any evidence of an intention to make an agreement different from the one expressed by the language used therein. We therefore fail to find any evidentiary support for the finding ''That defendant understood by the agreement of November 11, 1938, that she had assigned the one-fourth interest in the partnership standing in her name to Louis W. Thompson, subject to the payments therein provided.'' There is likewise insufficient evidentiary support, insofar as the defendant is concerned, for the finding that under the agreement of November 11, 1938, the parties thereto intended to transfer and assign the interest in the partnership which then stood in the name of Mrs. Levereau to Louis Thompson.

Plaintiff also seeks to bring to her assistance the well settled rule that the practical construction placed upon a contract by the parties is strong evidence of their intention. (See *McCartney* v. *Campbell* (1932), 216 Cal. 715, 719-720 [16 P.2d 729]; *Long Beach Drug Co.* v. *United Drug Co.* (1939), 13 Cal.2d 158, 167 [88 P.2d 698, 89 P.2d 386]; *Roy* v. *Salisbury* (1942), 21 Cal.2d 176, 184 [130 P.2d 706].) In line with this principle the court found that subsequent to the execution of the agreement the parties thereto interpreted it, as an assignment of the interest to Louis Thompson. Then follows a series of facts which presumably are intended to support such finding. The first of these is that ''the profits from the said one-fourth interest in the partnership were paid to Louis W. Thompson.'' There was no change in the han-

dling of the profits from defendant's quarter interest either after or as a result of the agreement. They had been paid to Louis all along, except for a few months in 1935, pursuant to defendant's written authorization dated April 18, 1935. The next recited fact is that ''income tax returns filed by the partnership subsequent to the execution of the document reflected Louis W. Thompson as a half owner in the business.'' But there is no evidence that defendant ever saw one of these returns or knew of this practice. The finding then recites that ''no statements of the business were furnished defendant subsequent to the execution of the agreement in question.'' While the failure of the other members of the partnership to furnish defendant such statements may have some bearing on their interpretation of the agreement, it can certainly have none on the defendant's. She of course is not responsible for what others may have failed to do. Furthermore, Louis had looked after defendant's affairs for years and by the agreement here under consideration had undertaken to act for and represent her interest in the conduct and management of the business. The next statement is that ''defendant received only such amount as was necessary to pay her bills which exceeded the sum of $100.00 per month.'' This is simply in accordance with the provisions of the agreement. It has no significance whatever as to any practical interpretation, by the defendant, of the agreement as an assignment of her interest. The final statement in the finding is that ''during the period intervening between the execution of the agreement of November 11, 1938, and some time after the death of Louis W. Thompson in May, 1942, defendant never asserted any claim to the one-fourth interest in the partnership or the profits therefrom and never attempted to exercise any authority or participate in any way in the partnership affairs.'' Of course defendant never asserted any claim to the profits. Under her written authorization of April 18, 1935, they were to be paid to Louis and to be so shown on the books of the company. Nor was there any occasion for her to assert any claim to the quarter interest in the partnership because no one had challenged her ownership of such interest until Louis died. When plaintiff sought to claim this interest as part of the estate of Louis defendant promptly asserted her claim of ownership. Just why defendant's failure to attempt to exercise any authority or participate in the partnership affairs has any significance on the question of the prac-

tical interpretation of the agreement by defendant as an assignment of her interest is not apparent. She had not attempted to exercise any authority or to participate in the partnership affairs even before the agreement in question. To have attempted such thereafter would have been in contravention of that agreement. It was Louis' duty to act for and represent her interest in the partnership. It should be noted in this connection that the bookkeeper who opened the books of the company on August 1, 1935, and has since handled them, testified that the books at all times showed under the proprietorship account a capital investment of Marie K. Thompson, $1,000, Louis W. Thompson, $500, and Belle Levereau, $500, and it was stipulated that all statements prepared by the bookkeeper showed this proprietorship account as it thus appeared upon the books of the company. The testimony is that the last statements relating to the partnership business were furnished defendant "About four years ago." This testimony was given on June 22, 1943. This would indicate that she saw such statements after the agreement of November 11, 1938. (The court's finding to the contrary on this point does not appear to be supported by the evidence.) Her examination of such statements would have immediately revealed that the books, which she never examined, reflected that she owned a quarter interest in the business. Such reflection would have been in accordance with the testimony of witness Horn that Louis told him, when they were discussing company financing, that Mrs. Levereau had a 25 per cent interest in the business. This was subsequent to the date of the agreement. We are unable to find anything in the conduct of the defendant subsequent to the agreement of November 11, 1938, which can be said to indicate an intention on her part to thereby and then assign her quarter interest in the partnership business to Louis. The finding to that effect is therefore lacking in evidentiary support.

As we have already pointed out there was no evidence of any negotiations leading up to the agreement in which the terms of a proposed agreement were discussed and there was nothing in the circumstances of the parties at the time they made the agreement, or in their subsequent conduct in carrying out the agreement, which tended in any degree to show that either one of them had in mind that defendant was transferring her interest to her brother or that in the event of a sale her share was to be valued as of November, 1938. ■ The

case then is one, in effect, without extrinsic evidence of any nature as to the intention of the parties. The reviewing court is therefore called upon to determine the meaning of the agreement, as a matter of law. (*Estate of Platt* (1942), 21 Cal.2d 343, 352 [131 P.2d 825]; *Moffatt* v. *Tight* (1941), 44 Cal.App.2d 643, 648 [112 P.2d 910]; *Mitchel* v. *Brown* (1941), 43 Cal.App.2d 217, 222 [110 P.2d 456]; *Estate of Janes* (1941), 18 Cal.2d 512, 515 [116 P.2d 438]; *Estate of DeLano* (1944), 62 Cal.App.2d 808, 814 [145 P. 2d 672].)

The views herein expressed make it unnecessary for us to pass upon other questions discussed by counsel in their briefs.

The judgment is reversed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied December 14, 1944, and respondent's petition for a hearing by the Supreme Court was denied January 12, 1945. Shenk, J., Carter, J., and Schauer, J., voted for a hearing.